UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

APRIL MEARSHA,

Plaintiff,

v.

SAMPLE SUPPORTS, LLC,

Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, April Mearsha, by and through her attorneys, HKM Employment Attorneys, LLP, for her Complaint and Jury Demand against Sample Supports, LLC ("Defendant" or the "Company") states and alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an employment discrimination case arising from Defendant's discrimination toward and wrongful termination of Plaintiff because she was a 41 year old woman, working at a company that prided itself on being "a millennial-run company," who complained of age discrimination internally and filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC").   After learning of Plaintiff's efforts to file a Charge of Discrimination, on December 4, 2018, Defendant placed Plaintiff on a 90-day Performance Improvement Plan ("PIP"), while telling Plaintiff: "You're part of management, you can't have a discrimination complaint like this, you're creating

a toxic environment for the company."  Only four days into Plaintiff's 90-day PIP, Defendant

suddenly terminated Plaintiff's employment for purported "continuing PIP violations" because of

her age and/or in retaliation for her protected opposition to age discrimination.

## PARTIES

2.      Plaintiff was and is a resident of Colorado at all times relevant to this Complaint.

3.      Defendant Sample Supports, LLC is a Colorado limited liability company with a

principal street office located at 620 Kimbark Street, Longmont, Colorado 80501.

## JURISDICTION AND VENUE

4.      Plaintiff incorporates by reference the above paragraphs as though set forth fully

and separately herein.

5.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28

U.S.C. § 1331.  This Court has jurisdiction over Plaintiff's state claim pursuant to 28 U.S.C. §

1367 because Plaintiff's state law claim is so related to the federal claims that they form part of

the same case or controversy.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the

employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

7.      Plaintiff incorporates by reference the above paragraphs as though set forth fully

and separately herein.

8.      Plaintiff filed her Charge of Discrimination Numbers 32A-2019-00192 and

FE2019117496 with the Equal Employment Opportunity Commission ("EEOC") and the

Colorado Civil Rights Division ("CCRD"), respectively, for age discrimination and retaliation on

or about December 6, 2018.  Plaintiff was issued a Notice of Right to Sue from the CCRD and has requested same from the EEOC.  As of the date of this filing, Plaintiff is still waiting on receipt of the Notice of Right to Sue from the EEOC, which will very likely be received prior to Defendant's responsive pleading.

9.     Plaintiff also filed Charge of Discrimination Numbers FE2019746292 and 32A-2019-00550 with detailed allegations regarding her claims against Defendant for age discrimination and retaliation with the CCRD and EEOC, respectively, on or about May 23, 2019. This Charge of Discrimination was administratively closed by the CCRD on August 29, 2019 because it was found to be duplicative of Charge of Discrimination Nos. FE2019117496 and 32A-2019-00192.

10.     Plaintiff additionally filed a Charge of Discrimination with the EEOC and CCRD, respectively, on or about November 29, 2019 for Defendant's continuing retaliatory harassment. At the time of this filing, a Notice of Right to Sue has not been issued from the EEOC and/or CCRD regarding Plaintiff's Charge of Discrimination for continuing retaliatory harassment. Plaintiff will amend this Complaint and Jury Demand upon receipt of a Notice of Right to Sue.

11.     Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

12.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

13.     Defendant provides a range of youth, adult and senior services for individuals with intellectual and developmental disabilities.

14.     Plaintiff began working for Defendant on or about April 9, 2018 as a Direct Care

Provider.

15.     Plaintiff was dedicated to the Company and its mission in providing services for disabled individuals, and Plaintiff at all times met or exceeded her employer's legitimate performance expectations.

16.     For example, Plaintiff earned a promotion in June 2018 as Defendant's Lead for Supported Employment and Supported Community Connections in the Denver area, which later expanded into Aurora as well.

17.     Defendant's management took pride in saying that the Company was "a millennial-run company" and, Plaintiff, as a 41-year-old woman, soon began experiencing management's prejudice toward employees over 40 years old.

18.     For example, in or around August 2018, Plaintiff applied for an internal job posting for Defendant's Day Program Manager position.

19.     Plaintiff met all the posted qualifications for Defendant's Day Program Manager position.

20.     Defendant's Day Program Manager position required a bachelor's degree and 3-5 years of experience working with individuals with disabilities.

21.     Plaintiff met both requirements.

22.     Plaintiff was one of at least three other internal candidates that had applied for the position.

23.     The other two employees of Defendant's that applied for the position were Heath Conde and Mariah Skelton.  Upon information and belief, both Mr. Conde and Ms. Skelton were in their 20's.

24.     Upon information and belief, neither Mr. Conde nor Ms. Skelton met the minimum requirement of having 3-5 years of experience working with people with disabilities.

25.     Defendant's Regional Director, Kay Speake (under 40 years old), interviewed Plaintiff, Mr. Conde and Ms. Skelton on the same morning in August 2018.  The following day, Ms. Speake announced that she had made her hiring decision for the position based on the "culture index" that Defendant uses, and that she felt Mr. Conde, an approximately 25-year-old at the time, was the best person for the position, even though he was less qualified as compared to Plaintiff and did not meet the position's minimum qualifications.

26.     Immediately following Defendant's promotion decision, Plaintiff followed up with Ms. Speake to ask what she could have done differently to be selected for the position.  Plaintiff also explained her confusion about Mr. Conde not meeting the position's minimum qualifications. Ms. Speake, again, referred to Defendant's "culture index."  Ms. Speake said that she would sit down with Plaintiff and figure out a path with Defendant that would allow Plaintiff to move up into higher positions.  That sit-down never occurred, despite Plaintiff requesting it on multiple occasions.

27.     In late-August to early-September 2018, Plaintiff engaged in protected activity by contacting the Colorado Civil Rights Division ("CCRD") for purposes of filing a Charge of Discrimination concerning Defendant's discriminatory promotion decision based on her age.  The intake paperwork provided by the CCRD asked Plaintiff to list witnesses to the discrimination. Plaintiff listed an employee that was separating from the Company, and specifically decided not to list any other current employees due to her fear that they would be retaliated against by Defendant.  Plaintiff also informed the employee she listed on the CCRD's intake paperwork that

she might be contacted by the CCRD during its investigation of her Charge of Discrimination.

28.    Plaintiff eventually signed her Charge of Discrimination on December 1, 2018 and submitted same on or before December 6, 2018.

29.    On or about September 14, 2018, Plaintiff also engaged in protected activity when she sent an email to Defendant's Human Resources and Business Operations Manager, Katelyn Horn, requesting that they set up a time to discuss her concerns of age discrimination.  Plaintiff specifically noted in her email that she was "very concerned to bring this to anyone's attention for fear of retaliation."

30.    Despite that statement, Ms. Horn responded to Plaintiff's email copying multiple members of management – including, Ms. Speake and Mr. Conde.

31.    Plaintiff felt the Company was discouraging her from any further protected activity when Ms. Horn also explained, "It is important for you to know that our transparency allows the leadership in your region to remain completely aware of your concerns[.]"

32.    Ms. Horn also invited Ms. Speake, the very person about whom Plaintiff's complaint of age discrimination was against, to join in the meeting Plaintiff requested.  Plaintiff was reasonably intimidated and frustrated about not being allowed to meet with Defendant's human resources in a confidential setting to communicate her concerns of age discrimination.  Still, Plaintiff agreed to meet with Ms. Horn and Ms. Speake to discuss her concerns of age discrimination, as well as additional training Plaintiff needed with Excel and Defendant's software system, Asana.

33.    At Plaintiff's meeting with Ms. Speake and Ms. Horn, Plaintiff explained her concerns regarding Defendant's so-called "culture index" that Defendant used to make personnel

decisions and its bias against older workers.  Ms. Speake was dismissive of Plaintiff's concerns and again promised Plaintiff a sit-down, during which Ms. Speake claimed she would show Plaintiff her "culture index" and how it fit with the Company, as well as talk about Plaintiff's future career path with the Company.

34.     Notably, Plaintiff was supposed to be having weekly supervision meetings with Ms. Speake since approximately August 2018, though her supervision meetings never happened until December 6, 2018, two days before she was abruptly terminated.  Prior to December 6, 2018, every supervision meeting Plaintiff was supposed to have with management was canceled, repeatedly confirming that Defendant did not intend to engage in any reasonable action to address Plaintiff's concerns of age discrimination.  During that same time, supervision meetings took place on a routine basis for Plaintiff's younger coworkers.

35.     Defendant also consistently failed and/or refused to provide Plaintiff with adequate training regarding Excel and the Asana software that Defendant expected Plaintiff to be able to use, despite Plaintiff's repeated requests for same.   With respect to Asana, Plaintiff was consistently told by Ms. Speake and others: "Just don't have red tasks, just change the date on the task so that you don't have any red tasks."

36.     In or around September 2018, Plaintiff also informed Defendant that she intended to file a Charge of Discrimination with the CCRD and/or the EEOC.

37.     On or about December 4, 2018, Defendant retaliated against Plaintiff for her protected internal and external complaints of discrimination by disciplining her for fabricated performance issues and imposing a 90-day Performance Improvement Plan ("PIP").

38.     Defendant's pretextual justification for imposing the PIP was based in part on

scheduling that Ms. Speake and Murphy McCraken, Plaintiff's direct supervisor at the time, had done in or around the last week of November 2018. Plaintiff was responsible for allocating the individuals scheduled to work by Ms. Speake and Ms. McCraken with the clients they had for the day in a manner to ensure the clients' safety during the groups' scheduled activities outside the office.

39.     Plaintiff put together one program group of five clients. Groups of five clients had often been arranged by management in the past, and Ms. Speake had often gotten upset if Plaintiff created groups of less than five clients, because Ms. Speake and the Company preferred to increase the number of clients that the Company could have based on the number of staff members scheduled to work each day. For instance, the Company had organized groups of sometimes as many as seven clients. Plaintiff was also aware that Ms. Speake and Ms. McCraken had organized groups of five clients earlier that same week. In addition, on this particular day, on or about November 29, 2018, Plaintiff believed that she was the only person in management that was in the office, and management had told Plaintiff that a manager needed to be in the office at all times. Plaintiff accordingly did not believe that she could join the day program groups on their activities outside the office that day. Given the foregoing, and the fact that there were three clients present with known behavioral issues, Plaintiff organized the individuals into a group of five and a group of four; instead of into three groups of three.

40.     Later that day, one of the clients from the group of four eloped from the group, though she was not supposed to be out of the caregiver's line-of-sight. Plaintiff also learned that the staff members had decided to combine the two groups. Then, staff independently decided that one staff member would stay in the library to watch seven clients, and the other staff member

would take two clients that did not want to be in the library to drive around in the van.  This led to a client having the opportunity to elope.

41.     As soon as Plaintiff learned that the client was missing, Plaintiff called Ms. Speake. She explained that the staff had decided to organize the groups differently from what had been scheduled.  Still, Ms. Speake blamed Plaintiff for having arranged a group of five clients, though the client that had eloped had been a part of the group of four.  Ms. Speake told Plaintiff that Defendant's plan was "not to terminate, but to formally document."  Defendant then imposed a retaliatory PIP for fabricated and innocuous performance issues on December 4, 2018.

42.     During Plaintiff's December 4, 2018 meeting with Ms. Horn and Ms. McCraken regarding Defendant's retaliatory PIP, Plaintiff was told that she was purportedly not getting the schedule out on time, every time, though she again explained that she needed training on how to format an Excel spreadsheet in order to be able to prepare the final schedule.

43.     Plaintiff was also told for the first time that she had red tasks in Asana that she needed to work on completing, though she still had not received training on how to complete each of the tasks.

44.     Plaintiff was told that she had 90 days to improve.

45.     Plaintiff again explained to Ms. Horn and Ms. McCraken that she needed more training on how to use Defendant's software technology, including an understanding of how to use Asana and Excel formatting.  Ms. McCraken told her that she would address questions Plaintiff had on Asana and show Plaintiff how to format an Excel spreadsheet during the supervision meeting that she and Plaintiff had scheduled for two days later, on December 6, 2018.

46.     Plaintiff had also asked Ms. Speake for additional training using Defendant's

technology, specifically Excel formatting, on November 28, 2019.  Ms. Speake told Plaintiff that she remembered having trouble with Excel formatting as well.  She said, "It was one of the hardest things I ever had to do."  She also told Plaintiff that she had gotten training for a whole day so that she could understand how to use Excel when she first started using it.  Ms. Speake then promised that she would look into someone to do that training for Plaintiff.  However, Ms. Speake never followed up on Plaintiff's training request.

47.     The day after Plaintiff received the retaliatory PIP, December 5, 2018, Plaintiff was on approved PTO.  She was instructed by Ms. McCraken not to do any work while on PTO.  Plaintiff was therefore not able to complete any of her Asana tasks or assign any of them to Ms. McCraken for her supervision meeting the next day, December 6, 2018.

48.     On December 6, 2018, Plaintiff had her scheduled supervision meeting with Ms. McCraken.

49.     Plaintiff asked Ms. McCraken for help showing her how to format the schedule she was supposed to prepare using Excel.  Ms. McCraken very quickly tried to show Plaintiff how to format Excel spreadsheets.  When Plaintiff told Ms. McCraken that she was going too fast for Plaintiff to retain what she was showing Plaintiff, Ms. McCraken became very frustrated, said "fine," and stopped.

50.     Ms. McCraken then told Plaintiff that Mr. Conde had been telling other employees of Defendant's that Plaintiff was purportedly trying to solicit staff to testify on her behalf in support of her allegations to the CCRD that she had been discriminated against based on her age.

51.     Plaintiff told Ms. McCraken that she had not been attempting to solicit witnesses to testify on her behalf to support her Charge of Discrimination with the CCRD.

52.     Ms. McCraken then called Mr. Conde during the meeting, pulling him out of his training to facilitate another intimidating confrontation for Plaintiff.  Ms. McCraken explained that she and Ms. Speake had sent Mr. Conde an email sometime earlier telling him that they were planning on calling him during Plaintiff's next (and, for months, only) supervision meeting so he could discuss Plaintiff's allegations of age discrimination.  On the phone, Mr. Conde said that Plaintiff had purportedly been trying to get people to sign witness statements concerning her Charge of Discrimination with the CCRD and her allegations that Defendant's decision to promote Mr. Conde over Plaintiff was motivated by age.

53.     Ms. McCraken then demanded that Plaintiff tell her about her complaint of age discrimination with the CCRD.  Plaintiff told Ms. McCraken that Ms. Speake had already been made aware of Plaintiff's concerns regarding age discrimination.  Still, Ms. McCraken told Plaintiff: "You're a part of management, you can't have a discrimination complaint like this, you're creating a toxic environment for the company."  Ms. McCraken then abruptly ended the meeting.

54.     Prior to Ms. McCraken becoming angry about Plaintiff's Charge of Discrimination, Plaintiff had also asked for clarification on how to complete red tasks using Defendant's Asana software.  Ms. McCraken explained that if a task was program specific, Plaintiff would have to get permission from Molly Stover or Mr. Conde, Defendant's program managers, to complete the task or move its date.

55.     As instructed, Plaintiff requested permission to complete program-specific red tasks the next week, given that it was already late in the day on Thursday, and Plaintiff was scheduled for direct care the next day, Friday, December 7, 2018.  Both program managers

responded telling Plaintiff that next week would be fine for completion of their respective tasks.

56.     After Plaintiff's heated supervision meeting on December 6, 2018, Plaintiff began to panic about getting the schedule out on time, which required her to use Excel formatting.  Mr. Conde eventually told Plaintiff to send the schedule in a Word document, and that he would help her get it formatted into an Excel spreadsheet.  Plaintiff accordingly sent the schedule in a Word document to Mr. Conde and Ms. McCraken for approval before disseminating the schedule to staff. Mr. Conde said that he thought the schedule looked great, and that they would work together on getting it in an Excel format the next day.  Ms. McCraken, on the other hand, responded negatively again about Plaintiff not understanding Excel, as well as nit-picking the schedule Plaintiff created.

57.     The next day, on December 7, 2018, was "pajama Friday" for Defendant's clients. Plaintiff and her husband stayed up all night sowing 100 "snowballs" for a safe snowball fight for the clients.  Plaintiff then went to work early to do computer work and set up areas for the day so the clients could rotate through different activities.

58.     While working, Plaintiff received an alarming call that her 15-year-old daughter had been hit by a car and was in the hospital.  Plaintiff immediately called Ms. McCraken and Ms. Speake, but neither responded to her call.  Plaintiff also called Defendant's program managers, Ms. Stover and Mr. Conde, before reaching out to Ms. Speake again.  Ms. Speake finally returned Plaintiff's call and Plaintiff was given permission to go to the hospital.  Ms. Speake also told Plaintiff that she did not need to worry about coming back to work.  However, Ms. McCraken repeatedly called Plaintiff demanding a timeline as to when her Asana tasks would be complete while Plaintiff's daughter was being cared for in the hospital.

59.     After attending to her daughter in the hospital, Plaintiff came back to work because

she knew that she was scheduled for direct care for a client that was a high elope risk for behaviors that were damaging to him. Plaintiff ended up having to stay late that night because all staff had left and staff members coming in for the evening shift were running late. Plaintiff therefore had to keep Defendant's jewelry store open by herself – a store where some of Defendant's clients worked.

60.     At the same time, Plaintiff was trying to get the schedule transferred from a Word document into an Excel format. When staff finally showed up that evening, Plaintiff had sent out the Excel spreadsheet for the schedule. Plaintiff then went home exhausted after a long, draining day followed by no sleep the prior night.

61.     The next morning, December 8, 2018, Plaintiff received a call from Ms. Speake. Ms. Speake told Plaintiff, "I have some very bad news, April. You've been terminated effective immediately and we'll have a meeting on Monday." Plaintiff repeatedly asked why she was being terminated, and Ms. Speake repeated back, "ongoing PIP violations."

62.     Plaintiff immediately called Ms. Stover, Defendant's program manager and Plaintiff's former direct supervisor, in tears. Ms. Stover told Plaintiff she did not know anything about Plaintiff's termination. Later that night, Ms. Stover attended Defendant's holiday party and sent Plaintiff a text message saying that the decision to terminate Plaintiff had been made by Defendant's owner, Carmen Sample (under 40 years old).

63.     Defendant discriminated against Plaintiff based on her age and retaliated against Plaintiff for opposing discrimination by repeatedly setting Plaintiff up to fail.

64.     For instance, other regions in Colorado had separate Leads for Defendant's day programs, and a Lead for the supported groups. However, Plaintiff was expected to be a lead for

both the day programs and the supported groups in Denver, which also then expanded to include Aurora.

65.     Upon information and belief, since Plaintiff's termination, Defendant has hired at least two more Leads for the Denver/Aurora areas to share the responsibilities Plaintiff was expected to shoulder on her own, without support or training from management.

66.     In addition, since Plaintiff's termination, upon information and belief, Defendant has required Mr. Conde to step down from his day program manager position due to repeated allegations of sexual assault committed by one of Defendant's clients on two other clients.  When the first instance of sexual assault occurred in or around Mid-November 2018, Mr. Conde chose not to report the incident to law enforcement, despite Plaintiff's insistence that the incident had to be reported to authorities.  As a result of Mr. Conde's inaction, later that same week, the same client sexually assaulted a second client of Defendant's.

67.     While Defendant purportedly terminated Plaintiff for "ongoing PIP violations" only four days into Defendant's retaliatory 90-day PIP, without any meaningful opportunity for improvement, Mr. Conde was allowed to remain employed with Defendant, where he was allowed to go back to performing direct care for Defendant's clients.

68.     Since Plaintiff's termination, upon information and belief, Defendant further promoted a 23-year-old as Plaintiff's replacement to perform part of Plaintiff's former position as Defendant's Supported Community Connections Lead for Denver and Aurora.  The replacement, Megan Breer, had also notably been in charge of watching the client that sexually assaulted Defendant's other two at-risk clients.  At the time the sexual assaults occurred, Plaintiff had told Mr. Conde that it was appropriate to engage in correction action for Ms. Breer because she was

supposed to be in line-of-sight of the client that had committed the sexual assaults on both occasions.  Mr. Conde refused to impose any correction action, and Defendant further condoned his decision when it ultimately promoted Ms. Breer as Plaintiff's replacement.

69.     Upon information and belief, Defendant further promoted Mariah Skelton, who was approximately 23 years old, as Plaintiff's partial replacement to perform Plaintiff's job responsibilities as Defendant's Supported Employment Lead for Denver and Aurora.

70.     Defendant then had two Leads for Denver and Aurora, as opposed to only Plaintiff performing both roles for the same area.

71.     Since Plaintiff's termination, upon information and belief, Defendant also required Ms. Stover to step down from her day program manager position due to purported performance issues related to completing Asana tasks timely and/or timely fulfilling her job functions.  Upon information and belief, Ms. Stover was approximately 31 years old.  Defendant imposed corrective action short of termination before requiring Ms. Stover to step down from her management position, whereas Plaintiff was not given any reasonable opportunity for improvement regarding purported performance issues before Defendant decided to abruptly terminate Plaintiff.

72.     At Plaintiff's exit interview with Defendant's human resources manager, Cassie Nichols, on December 10, 2018, Ms. Nichols acknowledged being aware of negative statements Ms. McCraken had made to Plaintiff concerning her Charge of Discrimination, which occurred only two days prior to Plaintiff's termination for purportedly violating a 90-day PIP that had been imposed only four days prior to her abrupt termination.

73.     On or about June 2, 2019, Defendant began subjecting Plaintiff to further continuing retaliatory harassment due to her protected opposition to age discrimination and

retaliation.  More specifically, Defendant searched through Plaintiff's former work emails to try to uncover purported misconduct as a result of Plaintiff's protected activity in filing a Charge of Discrimination with the CCRD and EEOC.

74.     Upon information and belief, Defendant has not searched through the work emails of other current or former employees who have not engaged in protected opposition to discrimination.

75.     Respondent, through counsel, sent Plaintiff a letter on June 2, 2019 demanding that Plaintiff "return" certain emails that Defendant claimed Plaintiff had forwarded herself during her employment with Defendant with purported confidential information concerning Defendant's clients.  Plaintiff was accused to accessing confidential information using her own personal laptop and her own personal Gmail account.

76.     At all relevant times during Plaintiff's employment, Plaintiff performed work outside of the office using Defendant's laptop.  Plaintiff did not have a personal laptop to use at any time while she worked for Defendant.

77.     At all relevant times during Plaintiff's employment, Plaintiff was instructed by a member of management to forward her work emails to her personal email account for purposes of keeping records of important information she might need to access outside of work.  Plaintiff accordingly forwarded certain work emails to her personal email account for that purpose, though Plaintiff did not have internet access at her home and could not access those emails outside of the office using her company laptop.

78.     Still, beginning on June 2, 2019 and thereafter, Defendant has demanded that Plaintiff sign an affidavit drafted by Defendant's counsel that would require Plaintiff to swear

under penalty of perjury that she had emailed herself confidential information concerning Defendant's clients, that she had returned those emails in an unspecified manner to Defendant, and that she no longer had those emails in her personal Gmail account – effectively requiring Plaintiff to attest to deletion of potentiality relevant evidence, i.e., spoliation.

79.     Upon information and belief, Defendant has not demanded that any of its other current or former employees sign a self-serving affidavit attesting to return and/or deletion of work-related emails or other emails purportedly containing confidential information.

80.     For example, at least three former employees of Defendant's have continued to have access to confidential information concerning Defendant's clients for months following their respective separations from Defendant.  However, those three former employees have not engaged in the protected activity of filing Charges of Discrimination against Defendant.  As a result, those three former employees (and, upon information and belief, Defendant's other current and former employees) have not been subjected to hyper-surveillance in an effort to fabricate purported misconduct, accusations of purported misconduct, demands to return digitally stored information containing purported confidential information, or demands to sign self-serving affidavits drafted by Defendant that would be tantamount to swearing that Plaintiff had engaged in misconduct and engaged in spoliation of evidence.

81.     Defendant has continued to subject Plaintiff to harassment on an ongoing basis since June 2, 2019.  For example, on September 13, 2019, Defendant demanded that Plaintiff pay all the costs for Defendant's forensic expert to obtain access to Plaintiff's Gmail account and obtain and forensic image so that Defendant could search through Plaintiff's Gmail account and attempt to use it to Plaintiff's detriment.  In doing so, Defendant was engaging in additional retaliatory

harassment to attempt to intimidate Plaintiff into foregoing claims for violations of her civil rights.

82.     In addition, though at least three former employees of Defendant's continued to have access to confidential information regarding Defendant's clients for months or more after their separations from Defendant, upon information and belief, Defendant has only targeted Plaintiff in demanding that Plaintiff pay significant costs for Defendant to gain access to her Gmail account – which contains Plaintiff's confidential medical information and attorney-client privileged communications – for purposes of searching it to try to obtain some evidence of purported misconduct in retaliation for Plaintiff pursuing violations of her civil rights.  As a result of Defendant's continuing retaliatory harassment, including in the form of threats of civil and administrative liability for HIPPA-related fines, Plaintiff has been forced to incur costs in forensic expert fees and will likely have to continue to do so in order to pursue violations of her civil rights.

## FIRST CLAIM FOR RELIEF
### (Discrimination in Violation of the Age Discrimination in Employment Act ("ADEA"))

83.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

84.     At all times relevant to this case, Plaintiff has been at least 40 years of age and therefore protected by the ADEA, 29 U.S.C. §§ 621 – 634.

85.     At all times relevant to this case, Defendant was an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b).

86.     Although Plaintiff at all times successfully performed her job, Defendant discriminated against Plaintiff on the basis of her age by subjecting her to less favorable terms, conditions, and privileges of employment, including, without limitation, failing to promote Plaintiff, failing or refusing to provide Plaintiff adequate training regarding Defendant's software,

imposing heightened performance expectations and a disproportionate workload on Plaintiff, subjecting Plaintiff to a retaliatory PIP for fabricated and/or innocuous performance issues, and terminating Plaintiff's employment.

87.     Defendant's above-described age-related employment practices and wrongful termination of Plaintiff was intentional and motivated by Plaintiff's age.

88.     Defendant knowingly and willfully engaged in the above-described age-related employment practices and discriminatory termination of Plaintiff on the basis of her age.

89.     As a direct and proximate result of Defendant's above-described age-related employment practices, Plaintiff has suffered damages, including lost wages and benefits; and she is entitled to such general and special damages, economic losses, liquidated damages, punitive damages and attorneys' fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the Age Discrimination in Employment Act ("ADEA"))

90.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

91.     Plaintiff engaged in activity protected by the ADEA pursuant to 29 U.S.C. § 623(d) when she internally reported her concerns of age discrimination on or about September 15, 2018.

92.     Plaintiff further engaged in activity protected by the ADEA when she contacted the CCRD and/or EEOC for purposes of filing a Charge of Discrimination against Defendant concerning age discrimination and retaliation, which was formally submitted on or about December 6, 2018.

93.     Defendant unlawfully retaliated against Plaintiff by failing or refusing to provide Plaintiff adequate training regarding Defendant's software, imposing heightened performance

expectations and a disproportionate workload on Plaintiff, subjecting Plaintiff to a retaliatory PIP for fabricated and/or innocuous performance issues, terminating Plaintiff's employment, and engaging in continuing retaliatory harassment toward Plaintiff for innocuous conduct that was approved by management and/or that other employees of Defendant's have engaged in without negative consequence.

94.     A causal connection exists between Plaintiff's protected activities and the Defendant's unlawful materially adverse employment actions.

95.     Defendant further knew about Plaintiff's protected activities at the time that Defendant engaged in the above-described unlawful materially adverse employment actions.

96.     Defendant acted knowingly and willfully in engaging in the above-described age-related employment practices, retaliatory termination of Plaintiff, and continuing retaliatory harassment, in that Defendant knew or showed reckless disregard that its conduct was prohibited by the ADEA.

97.     As a direct and proximate result of Defendant's above-described age-related employment practices, Plaintiff has suffered damages, including lost wages and benefits; and she is entitled to such general and special damages, economic losses, liquidated damages, punitive damages and attorneys' fees and costs as permitted by law.

### THIRD CLAIM FOR RELIEF
### (Wrongful Termination in Violation of Public Policy)

98.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

99.     Defendant punished or otherwise retaliated against Plaintiff for making a good faith report regarding a practice, procedure, action and/or failure to act with regard to the safety of

Defendant's at-risk clients.

100.    The essence of the public-policy exception to at-will employment status is that an employee has a cognizable claim for wrongful discharge where the discharge contravenes a clear mandate of public policy. *Martin Marietta Corp. v. Lorenz*, 823 P.3d 100, 107 (Colo. 1992).

101.    Claims for wrongful discharge under Colorado's public-policy exception have included termination of an employee for (1) refusal to participate in illegal activity; (2) the employee's refusal to forsake the performance of an important public duty or obligations; (3) the employee's refusal to forego the exercise of a job-related legal right or privilege; (4) the employee's whistleblowing activity or other conduct exposing the employer's wrongdoing; and (5) the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice or retaliation. *Id.*

102.    An at-will employee will establish a *prima facie* case for wrongful discharge under Colorado's public-policy exception if the employee presents evidence on the following elements: (1) that the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; (3) and that the employee was terminated as a result of refusing to perform the act directed by the employer and/or for exercising a public duty or job-related right or privilege. *Id.* at 109.

103.    Public policy must be clearly mandated such that the acceptable behavior is concrete and discernible, as opposed to a broad hortatory statement of policy that gives little direction as to the bounds of proper behavior.   *Rocky Mountain Hosp. & Medical Service v. Mariani*, 916 P.2d 519, 525 (Colo. 1996).   Statutes by their nature are the most reasonable and common sources for defining public policy.   *Id.*

### Sources Establishing Public Policy

104.    Plaintiff's termination was unlawful and violates public policy because she was terminated for making good faith reports regarding compliance with state laws enacted to promote the safety of at-risk individuals, as well as victim safety.

105.    C.R.S. § 18-8-115 provides:

> "It is the duty of every corporation or person who has reasonable grounds to believe that a crime has been committed to report promptly the suspected crime to law enforcement authorities.  Notwithstanding any other provision of the law to the contrary, a corporation or person may disclose information concerning a suspected crime to other persons or corporations for the purpose of giving notice of the possibility that other such criminal conduct may be attempted which may affect the persons or the corporations notified."

106.    C.R.S. § 26-3.1-102 states: "Any person providing health care or health-care-related services" … and "[p]ersons performing care management or assistant services for at-risk adults," among others, "who observes the mistreatment or self-neglect of an at-risk adult or who has reasonable cause to believe that an at-risk adult has been mistreated or is self-neglecting and is at imminent risk of mistreatment or self-neglect is urged to report such fact to a country department not more than twenty-four hours after making the observation or discovery."

107.    Plaintiff engaged in activity encouraged by Colorado public policy when she urged

Defendant to report sexual assault committed by one of Defendant's clients on another at-risk client. In doing so, Plaintiff had reasonable cause to believe the sexual assault constituted a crime and that there was a possibility that other such criminal conduct may be attempted. Other such criminal conduct did occur within the same week.

108.    Plaintiff further engaged in activity encouraged by Colorado public policy when she urged Defendant to report sexual assault committed on Defendant's at-risk client(s) to the authorities and objected to Defendant's refusal to do so. Plaintiff had reasonable cause to believe the circumstances surrounding the sexual assaults committed on Defendant's at-risk client(s) required reporting the event(s) to authorities.

109.    Within approximately three weeks following Plaintiff's above-described protected activity, Defendant subjected Plaintiff to a retaliatory PIP and terminated Plaintiff's employment.

110.    Defendant terminated Plaintiff in retaliation for Plaintiff's good faith attempts to urge Defendant to follow Colorado's reporting requirements concerning the commission of crimes and the safety of at-risk individuals, and in retaliation for Plaintiff's objections when Defendant refused to follow same.

111.    Defendant's above-described conduct and retaliation toward Plaintiff was willful and wanton and attended by circumstances of malice and reckless disregard for the rights of Plaintiff.

112.    As a result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and she is entitled to such general and special damages, economic damages, and garden-variety emotional distress damages as permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendant and order the following relief as allowed by law:

A.      Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B.      All legal and equitable relief available under the ADEA, including liquidated damages;

D.      Punitive damages for all claims as allowed by law;

E.      Attorneys' fees and costs of this action;

F.      Pre-judgment and post-judgment interest at the highest lawful rate; and

G.      Such further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff requests a trial by jury.

Respectfully submitted this 23rd day of December 2019.

HKM EMPLOYMENT ATTORNEYS LLP

By: _s/ Shelby Woods_____
     Claire E. Hunter
     Shelby Woods
     HKM Employment Attorneys LLP
     730 17th Street, Suite 750

Denver, Colorado 80202
chunter@hkm.com
swoods@hkm.com
*Attorneys for Plaintiff April Mearsha*